## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL E. VACEK, JR., Derivatively on Behalf of WALTER INVESTMENT MANAGEMENT CORP., | Index No: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| GEORGE M. AWAD, DANIEL G. BELTZMAN, MICHAEL M. BHASKARAN, NEAL P. GOLDMAN, WILLIAM J. MEURER, ALVARO G. de MOLINA, VADIM, PERELMAN, and ANTHONY N. RENZI, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and, | |
| WALTER INVESTMENT MANAGEMENT CORP., Nominal Defendant. | |

Plaintiff Michael E. Vacek, Jr. ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Walter Investment Management Corp. ("Walter Investment" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Walter Investment with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Walter Investment against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties and unjust enrichment that occurred between May 3, 2016 and the present (the "Relevant Period") and have caused substantial harm to Walter Investment.

2.     Walter Investment describes itself as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans.

3.     Walter Investment has a history of submitting false claims related to servicing reverse mortgage loans, and deceiving homeowners relating to loan servicing and modifications which resulted in two settlements with federal agencies and Walter Investment paying more than $92 million in fines.

4.     In the present action and during the Relevant Period, Walter Investment engaged in what may be similar conduct involving some of the same subsidiaries and where Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company was involved in fraudulent practices that violated the False Claims Act; (b) the Company's Ditech subsidiary had a material weakness in its internal controls over financial reporting; and (c) resultantly, the Company lacked adequate internal controls over financial reporting.

**JURSIDICTION AND VENUE**

5.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.     Venue is proper in this Court under 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and by doing

business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**A.**    **Plaintiff**

7.    ***Plaintiff Michael E. Vacek, Jr.*** ("Plaintiff") is, and was at relevant times, a shareholder of Walter Investment.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of Alabama.

**B.**    **Nominal Defendant**

8.    ***Nominal Defendant Walter Investment Management Corp.*** is a Maryland Corporation with its principal executive offices located at 1100 Virginia Drive, Suite 100, Fort Washington, PA.   Walter Investment describes itself as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans.

**C.**    **Director Defendants**

9.    ***Defendant George M. Awad*** ("Awad") has served as a director of the Company and Chairman of the Board since June 2016.  Awad served as Interim Chief Executive Officer and President of the Company from June 2016 through September 2016.   Awad is a citizen of Connecticut.

10.    ***Defendant Daniel G. Beltzman*** ("Beltzman") has served as a director of the Company since December 2015, and previously served as Chairman of the Board from February 2016 through June 2016.  He has also served as a member of the Compensation and Human Resources Committee since 2015, a member of the Compliance Committee since March 2016, a member of the Nominating and Corporate Governance Committee since 2015, and as a member of the Finance Committee since March 2016.  Beltzman is a citizen of New York.

11.    ***Defendant Michael M. Bhaskaran*** ("Bhaskaran") was elected to serve as a director

of the Company on January 19, 2017.  On that date, Bhaskaran was appointed as a member of the Audit Committee and Compliance Committee.  Bhaskaran is a citizen of Massachusetts.

12.     **Defendant Neal P. Goldman** ("Goldman") was elected to serve as a director of the Company on January 19, 2017.  On that date, Goldman was appointed as the Chairman of the Compensation and Human Resources Committee and as a member of the Audit Committee. Goldman is a citizen of New York.

13.     **Defendant William J. Meurer** ("Meurer") has served as a director of the Company since April 2009.  He has served as a member and Chairman of the Audit Committee since 2009. Meurer is a citizen of Florida.

14.     **Defendant Alvaro G. de Molina** ("de Molina") has served as a director of the Company since September 2012.  He has served as a member of the Audit Committee since 2012, a member of the Compensation and Human Resources Committee since 2012, and as a member of the Compliance Committee since 2014.  de Molina is a citizen of North Carolina.

15.     **Defendant Vadim Perelman** ("Perelman") has served as a director of the Company since December 2015.  He has served as a member of the Compensation and Human Resources Committee since 2015, a member of the Compliance Committee since 2015, a member of the Nominating and Corporate Governance Committee since 2015, and as a member and Chairman of the Finance Committee since March 2016.  Perelman is a citizen of New York.

16.     **Defendant Anthony N. Renzi** ("Renzi") joined the Company and began serving as its Chief Executive Officer and President on September 12, 2016, and was elected to serve as a director of the Company on January 19, 2017.  Renzi is a citizen of Pennsylvania.

17.     The Company's website and its Proxy Statement filed with the SEC on April 5, 2017 ("2017 DEF 14A") both identify five (5) Corporate Governance Committees of the

Company: (i) Nominating and Corporate Governance Committee; (ii) Audit Committee; (iii) Compensation and Human Resources Committee; (iv) Finance Committee; and (v) Compliance Committee.  However, these two sources identify different membership as follows:

| Directors | Nominating and Corporate Governance Committee | | Audit Committee | | Compensation and Human Resources Committee | | Finance Committee | | Compliance Committee | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Per Website | Per 4/5/17 DEF 14A | Per Website | Per 4/5/17 DEF 14A | Per Website | Per 4/5/17 DEF 14A | Per Website | Per 4/5/17 DEF 14A | Per Website | Per 4/5/17 DEF 14A |
| George M. Awad | | | | | | | | | x | |
| Daniel G. Beltzman | x | Chair | | | x | x | x | x | x | x |
| Michael M. Bhaskaran | | | x | x | | | | | x | x |
| Neal P. Goldman | x | | x | x | Chair | Chair | x | x | x | x |
| William J. Meurer | | | Chair | Chair | | | | | | |
| Alvaro G. de Molina | | | x | x | x | x | x | x | | |
| Vadim Perelman | x | x | | | x | x | x | Chair | x | x |
| Anthony N. Renzi | | | | | | | | | | |

18.      Defendants Awad, Beltzman, Bhaskaran, Goldman, Meurer, de Molina, Perelman, and Renzi are hereinafter referred to as the "Director Defendants" or "Defendants".

## THE COMPANY'S AUDIT COMMITTEE CHARTER

19.      As members of Walter Investment's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business.

20.      Walter Investment's Audit Committee Charter states in relevant part:

**RESPONSIBILITIES AND DUTIES**

To fulfill its responsibilities and duties, the Audit Committee shall:

Financial Documents/SEC Reports Review

Review and discuss with financial management and the Corporation's independent registered public accounting firm the Corporation's annual consolidated financial statements and disclosures made in the section of the Corporation's Annual Report on Form 10-K ("Annual Report") entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," to be included in the Corporation's Annual Report prior to its filing with the SEC or the release of earnings for the year, and recommend to the Board whether the audited consolidated financial statements should be included in the Corporation's Annual Report.

Review and discuss with financial management and the Corporation's independent registered public accounting firm the Corporation's quarterly consolidated financial statements, and the disclosures to be made in the section of the Corporation's Quarterly Report on Form 10-Q (the "Quarterly Report") entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," to be included in the Corporation's Quarterly Report prior to its filing with the SEC or the release of earnings for the quarter, including the results of the registered public accounting firm's reviews of the quarterly financial statements.

Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Corporation's earnings press releases (including the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies that have not been previously reviewed by the Audit Committee. The Audit Committee's discussion in this regard may be general in nature (*i.e.*, discussion of the types of information to be disclosed and the type of presentation to be made).

Review and discuss, before disclosure to governmental bodies or the public, such other financial or other information as the Audit Committee may require.

Review disclosures made to the Audit Committee by the Corporation's Chief Executive Officer and Chief Financial Officer during their certification process for the Corporation's Annual Report and Quarterly Report concerning (a) any significant deficiencies in the design or operation of internal control over financial reporting or material weakness therein; and (b) any fraud involving management or other employees who have a significant role in the Corporation's internal control over financial reporting.

*        *        *

Financial Reporting Processes

In consultation with the independent registered public accounting firm, management and the internal auditors, review the integrity of the Corporation's financial reporting processes.

The Audit Committee must obtain and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

- all critical accounting policies and practices to be used by the Corporation;

- analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information

6

within generally accepted accounting principles related to material items that have been discussed with the Corporation's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm;

- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles;

- major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies, [any other actions taken in light of significant deficiencies and material weaknesses, and the adequacy of disclosures about changes in internal control over financial reporting]; and

- any other material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences.

Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Corporation.

Review and discuss with management and the independent registered public accounting firm the Corporation's guidelines and policies with respect to risk assessment and risk management. The Audit Committee should discuss the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.

Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time.

21.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Walter Investment, Defendants owed Walter Investment and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Walter Investment in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Walter Investment and its investors.

22.     Each director of the Company owes to Walter Investment and its investors the

fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

23.     To discharge their duties, the officers and directors of Walter Investment were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Walter Investment were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Walter Investment conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices,

make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

24.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Walter Investment, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## **SUBSTANTIVE ALLEGATIONS**

**Background**

25.     Walter Investment was founded in 1958 and is now based in Fort Washington, PA. Walter Investment operates as an independent servicer and originator of mortgage loans, and a servicer of reverse mortgage loans in the United States.  Walter Investment operates through three (3) segments: Servicing, Originations, and Reverse Mortgage.

26.     The Servicing segment performs services on behalf of third-party credit owners of

mortgage loans, as well as its mortgage loan portfolio; and subservicing for third-party owners of mortgage servicing rights.

27.     The Originations segment originates and purchases mortgage loans for third parties while retaining the servicing rights.

28.     The Reverse Mortgage segment performs servicing for third-party credit owners of reverse loans; and provides other services for the reverse mortgage market, such as real estate owned property management and disposition.

29.     On September 4, 2012, the Company to issue a press release that announced the acquisition of Reverse Mortgage Solutions, Inc. ("RMS").  RMS was founded in 2007 and is an originator and servicer of reverse mortgages.  RMS is one of 12 HUD-approved servicers.

30.     Walter Investment has had four (4) CEOs since October 2015: Mark O'Brian ("O'Brien"), Denmar Dixon ("Dixon"), Awad, and Renzi.

31.     On October 10, 2015, O'Brien resigned as CEO and President of Walter Investment.  On that same day, Walter Investment announced O'Brien's retirement and also stated in relevant part:

> **On October 2, 2015, and in connection with Mr. O'Brien's retirement, the Company and Mr. O'Brien entered into a retirement agreement** (the "Retirement Agreement").  The effective date of the Retirement Agreement will be October 10, 2015 (the "Effective Date"), and the Retirement Agreement can be rescinded before such time by Mr. O'Brien. **The Retirement Agreement provides that Mr. O'Brien will receive payments totaling $3.0 million**, payable as follows: (a) the amount of $500,000 on the Effective Date; (b) the amount of $1,150,000 on January 8, 2016; and (c) if Mr. O'Brien continues to perform his duties as Chairman of the Board through December 31, 2015, Mr. O'Brien (i) will continue to be paid his current base salary at $47,917 per month for eighteen months after the Effective Date and (ii) will be paid the amount of $487,500 on January 6, 2017, in each case, subject to the terms and conditions of the Retirement Agreement.  The Retirement Agreement also provides that (i) Mr. O'Brien will be entitled to be paid the full amount of shares earned based on performance with respect to his currently outstanding awards of performance shares (as if, solely for this purpose, Mr. O'Brien remained an employee of the Company through the date on which the

amount of the payout is determined), and (ii) Mr. O'Brien's currently outstanding (a) restricted stock units will vest on the Effective Date and (b) unvested options will vest on the Effective Date, in each case, subject to the terms and conditions of the Retirement Agreement. Mr. O'Brien has also agreed to certain non-competition and non-solicitation provisions for a period of 36 months from the Effective Date. Additionally, the Retirement Agreement contains certain non-disparagement and confidentiality provisions.  [Emphasis added].

32.     O'Brien's retirement came just one month after Walter Investment agreed to pay more than $29.5 million in fines to settle charges brought by the Department of Justice ("DOJ"). This settlement related to and included DOJ claims that the Company's subsidiaries, including RMS, violated the False Claims Act by submitting false reverse mortgage claims to the Department of Housing and Urban Development, and with the knowledge and support of Walter Investment ("RMS Settlement").

33.     On or about April 21, 2015, Green Tree Servicing LLC ("Green Tree"), a Walter Investment subsidiary entered into a Stipulated Order for Permanent Injunction and Monetary Judgement (the "Stipulated Order") with the Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau ("CFPB") where it agreed to pay $63 million for "mistreating borrowers." This Stipulated Order included a Data Integrity Requirement and Assessment, Home Preservation Requirement, and various Injunctions, including but not limited to, an Injunction Against False or Misleading Representations.

34.     Walter Investment later announced that it was merging Green Tree with another of Walter Investment's well-known subsidiaries, Ditech Mortgage Corp, to form a new company, Ditech Financial ("Ditech").

35.     Denmar Dixon, who was Walter Investment's Vice Chairman of the Board, Chief Investment Officer and Executive Vice President, replaced O'Brien as CEO and President in October 2015.

36.     On February 8, 2016, Walter Investment announced that Patricia Cook, Walter Investment's Executive Vice President and Ditech's President "left the Company." That same press release also stated that "[t]he Company intends to pay Ms. Cook a cash bonus in the amount of $300,000 for her service to the Company in 2015."

37.     On that same day, the Company announced that David Schneider ("Schneider") (the Company's Executive Vice President) will be named President of Ditech with responsibility for leading both the Servicing and Originations businesses.

38.     On March 2, 2016, the Company announced that Schneider was also being appointed as the Company's Chief Operating Officer ("COO"). The press release also stated in relevant part:

> Mr. Schneider, age 50, has served as Executive Vice President of the Company since October 2014 and President of Ditech Financial since January 2016, and has responsibility for all operations and strategic oversight of the Company's mortgage loan servicing and originations businesses. He previously served as President, Servicing of Ditech Financial from August 2015 to January 2016 and as President of Green Tree Credit Solutions LLC and its subsidiaries from October 2014 to August 2015. Mr. Schneider joined the Company in October 2013 as Executive Vice President, Business Development for Green Tree Servicing LLC ("Green Tree").

39.     On June 8, 2016, the Company announced that Denmar J. Dixon ("Dixon") resigned as CEO and as a director. As part of his resignation, the Company agreed to pay Dixon millions of dollars as part of a separation agreement. The press release also stated in relevant part:

> In connection with his resignation, the Company entered into a Separation Agreement and General Release of Claims with Mr. Dixon dated June 8, 2016 (the "Separation Agreement"). Pursuant to the Separation Agreement, the Company has agreed to pay Mr. Dixon, subject to certain conditions (including Mr. Dixon's release of any claims against the Company and agreement to provide transition services to the Company for the period of time between the date of the Separation Agreement and June 30, 2016, Mr. Dixon's last day of employment with the Company, and his execution and delivery of a supplemental release applicable to the period between the effective date of the Separation Agreement and June 30, 2016): (i) a prorated annual bonus for 2016 based on actual performance achieved under

the terms of the bonus plan, prorated for the number of days Mr. Dixon was employed by the Company during 2016; (ii) continued base salary for a period of eighteen (18) months; and (iii) continued payment of the annual bonus amounts (based on actual performance under the bonus plan, and at least equal to Mr. Dixon's 2016 target bonus of $1,200,000) that Mr. Dixon would have received had he remained employed for a period of eighteen (18) months after termination (without duplication with the prorated annual bonus described in clause (i)). The Company has also agreed to pay Mr. Dixon each month an amount equal to the premiums for him to continue his and his dependents' health and dental coverage under the plans sponsored by the Company pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA), until the earlier of the 18-month anniversary of his termination date or until he is eligible to receive comparable benefits from subsequent employment or government assistance. In lieu of the 2016 long-term incentive opportunity and certain rights to cash out equity awards described in Mr. Dixon's employment agreement, subject to the release of claims and supplemental release described above, ***Mr. Dixon will receive: (i) a cash payment of $2,250,000 within 45 days following the date of the Separation Agreement***; and (ii) 125,000 restricted stock units ("RSUs") issued under the Company's 2011 Omnibus Incentive Plan, as amended and restated, which RSUs will vest on June 30, 2016 and be settled in the form of shares of Company common stock as soon as practicable following June 30, 2016. With respect to Mr. Dixon's awards of RSUs, performance shares and options, all such awards will remain outstanding and continue to vest as though Mr. Dixon remained employed by the Company through each applicable vesting date, but will otherwise remain subject in all respects to the terms of the relevant plan. In recognition of the transition services to be provided by Mr. Dixon, Mr. Dixon will receive a cash payment of $200,000 on March 15, 2017. [Emphasis added].

40.    On June 8, 2016, Defendant Awad was elected to serve as the Company's interim

CEO and President.  The Company's press release stated in relevant part:

> In connection with his appointment as interim Chief Executive Officer and President of the Company, a director and Executive Chairman of the Board, the Company entered into a Letter Agreement with Mr. Awad dated June 8, 2016 (the "Letter Agreement") […]
>
> Pursuant to the Letter Agreement, Mr. Awad will be eligible to receive an award of 500,000 restricted stock units on or about June 30, 2016. The agreement governing such award will provide, among other things, that the restricted stock units will vest (i) ratably in annual installments over three years on September 30 of each of 2016, 2017 and 2018, (ii) upon a change in control and (iii) if Mr. Awad is not nominated for re-election as a director. During the Transition Period, Mr. Awad will be eligible for compensation provided to non-employee directors under the Company's non-employee director compensation policy.  Mr. Awad is also entitled to the same insurance,  indemnification,  compensation  and  expense  reimbursement

arrangements as apply to other non-employee directors of the Company.  [Emphasis added].

41.     On August 8, 2016, the Company announced that Defendant Renzi was elected to

serve as the Company's CEO and President.   The Company press release also stated in relevant

part:

> In connection with his election as Chief Executive Officer and President of the Company, on August 8, 2016, the Company entered into an employment agreement (the "Employment Agreement") with Mr. Renzi.  […]
>
> The Employment Agreement provides for a base salary of $500,000, subject to annual review and increase (but not decrease) by the Compensation and Human Resources Committee of the Board of Directors of the Company (the "Compensation Committee"). The Employment Agreement also provides for a guaranteed 2016 fiscal year bonus of $1,750,000, the payment of which is subject to Mr. Renzi's continued employment through the date of payment of the 2016 bonus. For each full fiscal year during the employment term beginning with the 2017 fiscal year, Mr. Renzi is eligible to receive an annual bonus in an amount to be determined by the Compensation Committee, which actual bonus payment amount will be contingent upon achievement of annual Company and individual performance objectives for the applicable fiscal year.
>
> *     *     *
>
> In addition, the Employment Agreement provides for a signing bonus of $2,500,000, payable in a lump sum cash payment on the first payroll date immediately following the Effective Date.
>
> *     *     *
>
> In the event of a termination of employment by the Company without Cause, due to non-renewal of the term of employment by the Company, or by Mr. Renzi for Good Reason, subject to Mr. Renzi's execution, delivery and non-revocation of a release of claims and compliance with the restrictive covenants by which he is bound, he will receive, in addition to certain accrued amounts.

42.     On October 12, 2016, the Company announced that Schneider, the Company's

Executive Vice President and COO, and Ditech's President "left the Company."

43.     On December 2, 2016, the Company announced that it had entered into a Separation

Agreement with Schneider, and that included Schneider receiving a payout of hundreds of

14

thousands of dollars.

## MATERIAL MISSTATEMENTS
## AND OMISSIONS DURING THE RELEVANT PERIOD

44.     On February 29, 2016, the Company filed its Annual Report on Form 10-K with the SEC, announcing its financial and operating results for the quarter and year ended December 31, 2015 (the "2015 Form 10-K").  The 2015 Form 10-K stated in relevant part:

**Consumer-Focused Rebranding**

During the third quarter of 2015, we consolidated Ditech Mortgage Corp and Green Tree Servicing into one legal entity, Ditech Financial, with one brand, Ditech, a Walter Company. We believe this rebranding and consolidation will allow for greater focus on our consumers, will enhance brand recognition as mortgage loans originated by Ditech Financial will be serviced by the same brand, will simplify the process and improve quality for the consumer and will provide us with greater opportunities to cross-sell. We are focused on increasing our recapture rates from the serviced portfolio and believe the enhanced brand recognition will contribute to improving our recapture performance.  The consolidation will also enable us to better leverage our resources and talent across the businesses and is expected to drive operational efficiencies. In addition, we exited the Originations segment's consumer retail channel in January 2016 and have focused on developing our Originations segment's consumer direct channel.  Further, we have made and are continuing to make investments in technology which are designed to facilitate the originations process for borrowers.

*     *     *

**Operational Efficiency**

In conjunction with our exit from the Originations segment's consumer retail channel in January 2016, we continued our expense reduction efforts and further reorganized Ditech Financial in an attempt to improve our efficiency.  One-time costs associated with the measures taken in January 2016 are estimated to be approximately $5 million. The consumer retail channel incurred a direct margin loss of approximately $11 million in 2015.  In addition to the elimination of this loss in future annual periods, the January 2016 reorganization activities are expected to result in additional annual cost savings of approximately $17 million. Further, as part of our ongoing technology improvement and customer experience enhancement initiatives, we commenced a project in February 2016 to review many of our operating processes.  We expect to complete our initial review of such processes in the second quarter of 2016 and plan to move forward with implementation of identified action items thereafter.

15

45.     On May 3, 2016, the Company filed its Quarterly Report on Form 10-Q with the

SEC, announcing its financial and operating results for the quarter ended March 31, 2016 (the "1Q

2016 Form 10-Q").  The 1Q 2016 Form 10-Q stated in relevant part:

**Costs Associated with Exit Activities**

During 2015, the Company took distinct actions to improve efficiencies within the organization, which included re-branding its mortgage loan originations business by consolidating Ditech Mortgage Corp and Green Tree Servicing into one legal entity with one brand, Ditech, a Walter Company.  Additionally, the Company took measures to restructure its mortgage loan servicing operations and improve the profitability of the reverse mortgage business by streamlining its geographic footprint and strengthening its retail originations channel. These actions resulted in costs relating to the closing of offices and the termination of certain employees as well as other expenses to institute efficiencies.  The Company completed these activities in the fourth quarter of 2015.

\*     \*     \*

**Operational Efficiency**

In conjunction with our exit from the Originations segment's consumer retail channel in January 2016, we continued our expense reduction efforts and further reorganized Ditech Financial in an attempt to improve our efficiency. One-time costs associated with the measures taken in January 2016 were approximately \$4 million. The consumer retail channel incurred a direct margin loss of approximately \$11 million in 2015. In addition to the elimination of this loss in future annual periods, the January 2016 reorganization activities are expected to result in additional annual cost savings of approximately \$17 million, with approximately \$15 million to be realized in 2016.  Further, as part of our ongoing technology improvement and customer experience enhancement initiatives, we commenced a project in February 2016 to review many of our operating processes. We expect to complete our initial review of such processes in the second quarter of 2016 and plan to move forward with implementation of identified action items thereafter.

46.     The 1Q 2016 Form 10-Q also stated the following concerning the Company's

internal controls over financial reporting:

**Changes in Internal Control Over Financial Reporting**

There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2016 covered by this Quarterly

Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

47.     On August 9, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC, announcing its financial and operating results for the quarter ended June 30, 2016 (the "2Q 2016 Form 10-Q"). The 2Q 2016 Form 10-Q stated in relevant part:

**Costs Associated with Exit Activities**

During 2015, the Company took distinct actions to improve efficiencies within the organization, which included re-branding its mortgage business by consolidating Ditech Mortgage Corp and Green Tree Servicing into one legal entity with one brand, Ditech, a Walter Company. Additionally, the Company took measures to restructure its mortgage loan servicing operations and improve the profitability of the reverse mortgage business by streamlining its geographic footprint and strengthening its retail originations channel. These actions resulted in costs relating to the closing of offices and the termination of certain employees as well as other expenses to institute efficiencies. The Company completed these activities in the fourth quarter of 2015.

48.     The 2Q 2016 Form 10-Q also stated the following concerning the Company's internal controls over financial reporting:

**Changes in Internal Control Over Financial Reporting**

There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2016 covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

49.     On November 9, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC, announcing its financial and operating results for the quarter ended September 30, 2016 (the "3Q 2016 Form 10-Q"). The 3Q 2016 Form 10-Q stated in relevant part:

**Costs Associated with Exit Activities**

During 2015, the Company took distinct actions to improve efficiencies within the organization, which included re-branding its mortgage business by consolidating Ditech Mortgage Corp and Green Tree Servicing into one legal entity with one brand, Ditech, a Walter Company. Additionally, the Company took measures to restructure its mortgage loan servicing operations and improve the profitability of

17

the reverse mortgage business by streamlining its geographic footprint and strengthening its retail originations channel.  These actions resulted in costs relating to the closing of offices and the termination of certain employees, as well as other expenses to institute efficiencies.  The Company completed these activities in the fourth quarter of 2015.

\*   \*   \*

**Subsequent Events**

On August 8, 2016, Ditech Financial and NRM executed an agreement whereby Ditech Financial agreed to sell to NRM all of Ditech Financial's right, title and interest in mortgage servicing rights with respect to a pool of mortgage loans, with sub-servicing retained.  After giving effect to certain adjustments based upon developments with respect to the MSR pool prior to the closing date and calculated in accordance with the NRM Flow and Bulk Agreement, this first bulk MSR transaction closed on October 3, 2016 and NRM purchased from Ditech Financial MSRs with an aggregate unpaid principal balance of $32.3 billion for a purchase price of $212 million.  On October 11, 2016, Ditech Financial agreed to sell to NRM mortgage servicing rights with respect to a pool of mortgage loans with an aggregate unpaid principal balance of $5.0 billion for a purchase price of $27 million (in each case subject to adjustment based upon developments with respect to the MSR pool prior to the closing date), with sub-servicing expected to be retained.  The closing of this second bulk MSR transaction between Ditech Financial and NRM under the NRM Flow and Bulk Agreement is subject to the receipt of certain government-sponsored entity and other approvals, various other conditions precedent and certain termination provisions.

50.    The 3Q 2016 Form 10-Q also stated the following concerning the Company's internal controls over financial reporting:

**Changes in Internal Control Over Financial Reporting**

There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended September 30, 2016 covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

51.    The statements in paragraphs 44-50 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or

failed to disclose that:  (a) the Company was involved in fraudulent practices that violated the False Claims Act; (b) the Company's Ditech subsidiary had a material weakness in its internal controls over financial reporting; (c) resultantly, the Company lacked adequate internal controls over financial reporting; and (d) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

## **THE TRUTH EMERGES**

52.     On March 14, 2017, the Company filed a Form 10-K with the SEC announcing the financial and operating results for the fourth fiscal quarter and fiscal year ended December 31, 2016 ("2016 Form 10-K").  The 2016 Form 10-K stated in relevant part:

> *We identified a material weakness in our internal controls over financial reporting.  If we do not adequately address this material weakness, if we have other material weaknesses or significant deficiencies in our internal controls over financial reporting in the future, or if we otherwise do not maintain effective internal controls over financial reporting, we could fail to accurately report our financial results, which may materially adversely affect our business and financial condition.*  […]

> For the year ended December 31, 2016, we concluded there was a material weakness in internal controls over financial reporting related to operational processes associated with Ditech Financial default servicing activities.  We have initiated steps to remediate this material weakness.  While we believe these steps will improve the effectiveness of our internal controls over financial reporting and remediate the material weakness, if our remediation efforts are insufficient to address the material weakness, or if additional material weaknesses in our internal controls are discovered in the future, they may adversely affect our ability to record, process, summarize and report financial information timely and accurately and, as a result, our financial statements may contain material misstatements or omissions.

> *      *      *

> As of December 31, 2016, we identified a material weakness in internal controls over operational processes within the transaction level processing of Ditech Financial default servicing activities. Specifically, we did not design and maintain effective controls related to our ability to identify foreclosure tax liens and resolve such liens timely, foreclosure related advances, and the processing and oversight of loans in bankruptcy status. This resulted in several adjustments to reserves during

the fourth quarter of 2016 totaling $16.3 million for exposures related to deficient processes within the operating control environment for default servicing. [Emphasis added].

53. The 2016 Form 10-K also disclosed that RMS was being investigated for potential violations of the False Claims Act:

In recent years, HUD and the DOJ have pursued actions against FHA-approved lenders, including RMS, under the False Claims Act, which imposes liability on any person who knowingly makes a false or fraudulent claim for payment to the U.S. government. Potential penalties are significant as these actions may result in treble damages and several large settlements have been entered into by HUD-approved mortgagees who have allegedly violated the False Claims Act. ***RMS received a subpoena dated June 16, 2016 from the Office of Inspector General of HUD requiring RMS to produce documents and other materials relating to, among other things, the origination, underwriting and appraisal of reverse mortgages for the time period since January 1, 2005. RMS also received a subpoena from the Office of Inspector General of HUD dated January 12, 2017 requesting certain documents and information relating to the origination and underwriting of certain specified loans. This investigation, which is being conducted in coordination with the U.S. Department of Justice, Civil Division, could lead to a demand or claim under the False Claims Act, which allows for penalties and treble damages, or other statutes***. [Emphasis added].

54. On release of the news, the Company's share price fell $1.30 from a closing price on March 13, 2017 of $2.70 per share to a close of $1.60 per share, a drop of approximately 40%.

55. On May 26, 2017, the Company filed a Form 8-K with the SEC, stating in relevant part:

On May 26, 2017, management of the Company, after consultation with Ernst & Young LLP ("EY"), the Company's independent registered public accounting firm, concluded that, due to an accounting error, as described below, the previously issued audited consolidated financial statements and other financial information contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and the previously issued unaudited consolidated financial statements and other financial information contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended June 30, 2016, September 30, 2016 and March 31, 2017 (the "Original Filings") should no longer be relied upon. The Audit Committee of the Board of Directors of the Company, acting on the recommendations of management and after consultation with EY, also concluded

that, due to such accounting error, the previously issued audited and unaudited consolidated financial statements and other financial information contained in the Original Filings should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon.

The Company has become aware of an error in the calculation of the valuation allowance on the deferred tax asset balances in the Original Filings. The Company's methodology effectively resulted in a duplication of the reversal of taxable temporary differences. Accordingly, the Company is in the process of revising its calculation to eliminate the duplication.

Although the Company has not determined the precise amount of the adjustments to the valuation allowance on the deferred tax asset balances included in the Original Filings, such amounts are anticipated to be material. The Company's net deferred tax asset balances were $273.8 million as of June 30, 2016, $425.9 million as of September 30, 2016, $299.9 million as of December 31, 2016, and $299.6 million as of March 31, 2017. The impact of these adjustments will be to materially reduce the overall net deferred tax asset balances by increasing the valuation allowance, and reducing the tax benefit recorded in the Company's previously issued consolidated statements of comprehensive loss.

These adjustments are not anticipated to have an effect on the reported net operating cash flows of the Company for the restated periods reflected in the Original Filings.

The Company will work with the Audit Committee to determine the amendments required to be made to the Original Filings to reflect the adjustment to the valuation allowance on the deferred tax asset balances as expeditiously as possible. Upon the completion of this process, which could identify further adjustments in addition to those discussed above, the Company anticipates filing required amendments to the Original Filings with the Securities and Exchange Commission (the "SEC") as soon as practicable to reflect the impact of the correction of the error.

The Company has reassessed the Company's internal control over financial reporting and disclosure controls and procedures in light of the error. The Company has determined that a material weakness relating to the ineffective review of the tax calculations associated with the valuation allowance on the deferred tax asset balances existed for the affected periods, and therefore the Company's internal controls over financial reporting and disclosure controls and procedures were ineffective. Further details and remediation plans will be reflected in the amended filings.

The Audit Committee and the Company's management have discussed the matters disclosed in this Item 4.02(a) with EY, the Company's independent registered public accounting firm.

The need to restate the Company's financial statements will require that the Company seek appropriate amendments, waivers and / or forbearances to a number of its and its subsidiaries' credit and financing arrangements, including the agreements described in Items 1.01 and 2.03 above, and certain other agreements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

56.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

57.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

58.     Plaintiff is a current owner of Walter Investment stock and has continuously been an owner of the stock during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and are prepared to do so.

59.     During wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

60.     The Board is currently comprised of eight (8) members: Awad, Beltzman, Bhaskaran, Goldman, Meurer, de Molina, Perelman, and Renzi.  Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, four (4) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

61.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects.

Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

62.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

63.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

64.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

65.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

66.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable

conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

67.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Renzi

68.     Defendant Renzi is not disinterested or independent, which is admitted by the Company in its 2017 Proxy, and therefore, is incapable of considering any demand.  Defendant Renzi is the President and CEO of the Company, and derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Renzi cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

### Defendant Perelman

69.     Defendant Perelman is the managing partner of Baker Street Management, LLC ("Baker Street").  Defendant Perelman and Baker Street have a combined beneficial ownership of Walter Investment stock of 23.93%.   At the end of 2015, Baker Street's fund was valued at $142 million, $123 million of which was invested in Walter Investment.  Baker Street has reported to the SEC that Walter Investment has been the only U.S. stock in its hedge fund's portfolio ever since.

70.     As a member of the Compliance Committee, Defendant Perelman's duties and responsibilities include monitoring the formulation and implementation of the Company's compliance management system "including its program for compliance with state and Federal

consumer financial protection laws, rules and regulations and other laws, rules, regulations, guidance and standards governing its consumer-oriented businesses." Defendant Perelman failed to meet his responsibilities of this committee as acknowledged in Walter Investment's 2016 Form 10-K, and as alleged herein.

71.     As a member of the Compensation and Human Resources Committee, Defendant Perelman was required to review and approve any severance or termination arrangements. As alleged herein, Walter Investment paid out millions of dollars to departing CEO's and other officers at a time when the Company settled wrongful conduct claims relating to RMS and Greentree (now Ditech) totaling in excess of $93 million, and also at a time when the Company was publicly reporting net losses. On information and belief, Plaintiff alleges that no Walter Investment Director, including Defendant Perelman conducted any due diligence relating to each and every exiting officer who received a payout to determine if said departure should be characterized as "for cause", or otherwise was entitled to or deserving of a separation payment.

72.     As a member of the Nominating and Corporate Governance Committee, Defendant Perelman's duties and responsibilities include, but are not limited to, overseeing a review of the independence of the directors, risks related to the Company's governance structure and processes, and develop, recommend to the Board, monitor a set of corporate governance guidelines, and review and approve each Committee's charter.

73.     Each and every Committee charter includes a "self-evaluation" provision, which provision was reviewed and approved by Defendant Perelman as a member of the Nominating and Corporate Governance Committee. By the terms of this "self-evaluation" provision each Committee, and the Board, completes an assessment of itself to determine (among other things) if it has fulfilled its duties and responsibilities. There is no outside or independent evaluation to

confirm that each director has fulfilled his duties and responsibilities.

74.   Because of Defendant Perelman's large stake in Walter Investment and for other reasons as alleged herein, Defendant Perelman himself is not independent and cannot and should not be tasked and trusted to determine the independence of himself and the other directors.

**Defendant Beltzman**

75.   Defendant Beltzman is the managing member of the general partner of Birch Run Capital Advisors, LP ("Birch Run").  Beltzman and Birch Run have a combined beneficial ownership of Walter Investment stock of 20.62%.   As stated in a November 17, 2015 bizjournal.com article:

> Beltzman's appointment [as a Walter Investment director] appears to be a preemptive strike against more aggressive investors who might seek to make deeper changes at Walter (NYSE: WAC), a Tampa firm that services and originates home loans.
>
> Walter's board adopted a shareholder rights plan in June after Baker Street Capital of Los Angeles bought up nearly 20 percent of the stock.  The so-called "poison pill" was intended to reduce the potential that any person or group could gain control of the company by open market accumulation or other tactics without paying a control premium, a news release said.
>
> Walter amended the shareholder rights agreement last week, to allow Birch Run to hold up to 25 percent of the stock, according to a regulatory filing.  ***Both Beltzman and Birch Run have agreed to vote all their stock at the company's 2016 annual meeting of shareholders in support of board-nominated directors and against any stockholder proposals not board-approved***.  [Emphasis added].

76.   As a member of the Compliance Committee, Defendant Beltzman's duties and responsibilities include, but are not limited to, monitoring the formulation and implementation of the Company's compliance management system "including its program for compliance with state and Federal consumer financial protection laws, rules and regulations and other laws, rules, regulations, guidance and standards governing its consumer-oriented businesses."  Defendant Beltzman failed to meet his responsibilities of this committee as acknowledged in Walter

Investment's 2016 Form 10-K, and as alleged herein.

77.     As a member of the Compensation and Human Resources Committee, Defendant Beltzman was required to review and approve any severance or termination arrangements.  As alleged herein, Walter Investment paid out millions of dollars to departing CEO's and other officers at a time when the Company settled wrongful conduct claims relating to RMS and Greentree (now Ditech) totaling in excess of $93 million, and also at a time when the Company was publicly reporting net losses.  On information and belief, Plaintiff alleges that no Walter Investment Director, including Defendant Beltzman, conducted any due diligence relating to each and every exiting officer who received a payout to determine if said departure should be characterized as "for cause", or otherwise was entitled to or deserving of a separation payment.

78.     As a member (and possibly its Chairman) of the Nominating and Corporate Governance Committee, Defendant Beltzman's duties and responsibilities include, but are not limited to, overseeing a review of the independence of the directors, risks related to the Company's governance structure and processes, and develop, recommend to the Board, monitor a set of corporate governance guidelines, and review and approve each Committee's charter.

79.     Each and every Committee charter includes a "self -evaluation" provision, which provision was reviewed and approved by Defendant Beltzman as a member of the Nominating and Corporate Governance Committee.  By the terms of this "self-evaluation" provision each Committee, and the Board, completes an assessment of itself to determine (among other things) if it has fulfilled its duties and responsibilities.  There is no outside or independent evaluation to confirm that each director has fulfilled his duties and responsibilities.

80.     Because of Defendant Beltzman's large stake in Walter Investment and for other reasons as alleged herein, Defendant Beltzman is not independent and cannot and should not be

tasked and trusted to determine the independence of himself and the other directors.

**Defendant de Molina**

81.     Defendant de Molina has served as a director of the Company since September 2012.   He has served as a member of the Audit Committee since 2012, a member of the Compensation and Human Resources Committee since 2012, and as a member of the Compliance Committee since 2014.  As a long-standing Board and Committees member, Defendant de Molina knew of the RMS Settlement and Stipulated Order and the agreements and requirements that accompanied these events.

82.     As the Chairman of the Audit Committee, Defendant de Molina's duties and responsibilities include that he must obtain and discuss with management and the independent registered public accounting firm regarding "major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies [any other actions taken in light of significant deficiencies and material weaknesses, and the adequacy of disclosures about changes in internal control over financial reporting.]"

83.     As a member of the Compliance Committee, Defendant de Molina's duties and responsibilities include, but are not limited to, monitoring the formulation and implementation of the Company's compliance management system "including its program for compliance with state and Federal consumer financial protection laws, rules and regulations and other laws, rules, regulations, guidance and standards governing its consumer-oriented businesses."

84.     Defendant de Molina failed to meet his responsibilities of these committees as acknowledged in Walter Investment's 2016 Form 10-K, and as alleged herein.

85.     As a member of the Compensation and Human Resources Committee, Defendant de Molina was required to review and approve any severance or termination arrangements.  As

alleged herein, the Company paid out millions of dollars to departing CEOs and other officers at a time when the Company settled wrongful conduct claims relating to RMS and Greentree (now Ditech) totaling in excess of $93 million, and also at a time when the Company was publicly reporting net losses.  On information and belief, Plaintiff alleges that no Walter Investment Director, including Defendant de Molina, conducted any due diligence relating to each and every exiting officer who received a payout to determine if said departure should be characterized as "for cause" or otherwise was entitled to or deserving of a separation payment.

86.     Based on the forgoing and on the other facts alleged herein, Defendant de Molina cannot be considered independent or disinterested, and any demand on him would be futile.

**Defendant Meurer**

87.     Defendant Meurer has served as a director of the Company since September 2009. He has served as a member of the Audit Committee since 2009, and is presently the chair of the Audit Committee.

88.     As a long-standing Board and Committee member, Defendant Meurer knew of the RMS Settlement and Stipulated Order and the agreements and requirements that accompanied these events.

89.     As the Chairman and a member of the Audit Committee, Defendant de Molina's duties and responsibilities include, but are not limited to, that he must obtain and discuss with management and the independent registered public accounting firm regarding "major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies [any other actions taken in light of significant deficiencies and material weaknesses, and the adequacy of disclosures about changes in internal control over financial reporting]."  Defendant Meurer failed to meet his responsibilities of this committee as acknowledged in Walter Investment's 2016 Form 10-K, and as alleged herein.

90.     Based on the forgoing and on the other facts alleged herein, Defendant Meurer

cannot be considered independent or disinterested, and any demand on him would be futile.

**Defendant Goldman**

91.     Defendant Goldman is a member of the Audit Committee, the Compliance Committee, is the Chairman of the Compensation and Human Resources Committee, and may be a member of the Nominating and Corporate Governance Committee.

92.     As a member of the Audit Committee, Defendant Goldman's duties and responsibilities include that he must obtain and discuss with management and the independent registered public accounting firm regarding "major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies [any other actions taken in light of significant deficiencies and material weaknesses, and the adequacy of disclosures about changes in internal control over financial reporting]."

93.     As a member of the Compliance Committee, Defendant Goldman's duties and responsibilities include, but are not limited to, monitoring the formulation and implementation of the Company's compliance management system "including its program for compliance with state and Federal consumer financial protection laws, rules and regulations and other laws, rules, regulations, guidance and standards governing its consumer-oriented businesses."

94.     Defendant Goldman failed to meet his responsibilities of these committees as acknowledged in Walter Investment's 2016 Form 10-K, and as alleged herein.

95.     As a member of the Compensation and Human Resources Committee, Defendant Goldman was required to review and approve any severance or termination arrangements.  As alleged herein, the Company paid out millions of dollars to departing CEOs and other officers at a time when the Company settled wrongful conduct claims relating to RMS and Greentree (now Ditech) totaling in excess of $93 million, and also at a time when the Company was publicly reporting net losses.  On information and belief, Plaintiff alleges that no Walter Investment Director, including Defendant Goldman, conducted any due diligence relating to each and every exiting officer who received a payout to determine if said departure should be characterized as "for cause" or otherwise was entitled to or deserving of a separation payment.

96.     As a (possible) member of the Nominating and Corporate Governance Committee, Defendant Goldman's duties and responsibilities include, but are not limited to, overseeing a review of the independence of the directors, risks related to the Company's governance structure and processes, and develop, recommend to the Board, monitor a set of corporate governance guidelines, and review and approve each Committee's charter.

97.     Each and every Committee charter includes a "self -evaluation" provision, which provision was reviewed and approved by Defendant Goldman as a member of the Nominating and Corporate Governance Committee.  By the terms of this "self-evaluation" provision each Committee, and the Board, completes an assessment of itself to determine (among other things) if it has fulfilled its duties and responsibilities.  There is no outside or independent evaluation to confirm that each director has fulfilled his duties and responsibilities.

98.     For the reasons as alleged herein, Defendant Goldman himself is not independent and cannot and should not be tasked and trusted to determine the independence of himself and the other directors.  This is further evidenced by his apparent approval the self-evaluation provision contained in each Committee's charter.

**Defendant Bhaskaran**

99.      Defendant Bhaskaran is a member of the Audit Committee and the Compliance Committee.

100.    As a member of the Audit Committee, Defendant Bhaskaran's duties and responsibilities include that he must obtain and discuss with management and the independent registered public accounting firm regarding "major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies [any other actions taken in light of significant deficiencies and material weaknesses, and the adequacy of disclosures about changes in internal control over financial reporting]."

101.    As a member of the Compliance Committee, Defendant Bhaskaran's duties and responsibilities include, but are not limited to, monitoring the formulation and implementation of the Company's compliance management system "including its program for compliance with state

and Federal consumer financial protection laws, rules and regulations and other laws, rules, regulations, guidance and standards governing its consumer-oriented businesses."

102.    Defendant Bhaskaran failed to meet his responsibilities of these committees as acknowledged in Walter Investment's 2016 Form 10-K, and as alleged herein.

**Defendant Awad**

103.    Defendant Awad has served as a director of the Company and Chairman of the Board since June 2016 and, upon information and belief, is a member of the Compliance Committee.  He also served as Interim Chief Executive Officer and President of the Company from June 2016 through September 2016.

104.    As a member of the Compliance Committee, Defendant Awad's duties and responsibilities include, but are not limited to, monitoring the formulation and implementation of the Company's compliance management system "including its program for compliance with state and Federal consumer financial protection laws, rules and regulations and other laws, rules, regulations, guidance and standards governing its consumer-oriented businesses."

105.    Defendant Awad failed to meet his responsibilities of this committee as acknowledged in Walter Investment's 2016 Form 10-K, and as alleged herein.

106.    Based on the forgoing and on the other facts alleged herein, including but not limited to, agreeing with, and participating in director "self-evaluation", and determination of independence by the majority of Board members of the Nominating and Corporate Governance Committee (Defendants Beltzman and Perelman) who themselves are not independent, Defendant Awad cannot be considered independent or disinterested, and any demand on him would be futile.

**As to All Director Defendants**

107.    Each and every Director Defendant is not disinterested or independent, and therefore, is incapable of considering demand as evidenced by the Board's concurrence and separate affirmative determination that each and every Walter Investment Director is independent, with the sole exception of Renzi (as discussed hereunder).

32

108.    The Company's 2017 DEF 14A states in relevant part:

Our Corporate Governance Guidelines provide that the Nominating and Corporate Governance Committee must oversee, at least annually, a review of the independence of our directors and candidates for membership on the Board of Directors, and report its findings to the Board of Directors.  Under our Corporate Governance Guidelines, a substantial majority of our Board of Directors is expected to be considered independent directors under applicable NYSE and SEC rules. Under NYSE rules, a director is not independent unless the Board of Directors affirmatively determines that he or she does not have a direct or indirect material relationship with the Company.  In addition, the directors who serve on the Audit Committee or the Compensation and Human Resources Committee must satisfy heightened independence standards established by the SEC and NYSE, as applicable.

In making its independence determinations, the Nominating and Corporate Governance Committee evaluates all relevant facts and circumstances, including the various commercial, charitable and employment transactions and relationships known to the committee, if any, that exist between us and our subsidiaries and the directors and the entities with which certain of our directors or members of their immediate families are, or have been, affiliated (including those identified through our annual directors' questionnaires). Based on its analysis, the Nominating and Corporate Governance Committee has affirmatively determined that each director, other than Mr. Renzi, is independent under applicable NYSE rules. The Board of Directors concurred and also affirmatively determined that each director, other than Mr. Renzi, is independent…

109.    The Company's Nominating and Corporate Governance Committee is comprised of Defendants Perelman, Beltzman, and Goldman.  As stated above, Defendants Perelman and Beltzman are the beneficial owners (directly or through their respective investment companies) of almost 45% of the stock of the Company and therefore could never be considered independent or disinterested.  Further, with this combined level of ownership, Defendant Perelman and Beltzman should not be two of the three members of the Nominating and Corporate Governance Committee and tasked with the responsibility of determining director independence.

110.    The Nominating and Corporate Governance Committee's duties and responsibilities include, but are not limited to, overseeing a review of the independence of the directors, risks related to the Company's governance structure and processes, and develop,

recommend to the Board, monitor a set of corporate governance guidelines, and review and approve each Committee's charter.

111.    Based on the forgoing and on the other facts alleged herein, including but not limited to, agreeing with, and participating in director "self-evaluation", and determination of independence by the majority of Board members of the Nominating and Corporate Governance Committee (Defendants Beltzman and Perelman) who themselves are not independent, no Director can be considered independent or disinterested.

## CAUSE OF ACTION

### Against Defendants for Breach of Fiduciary Duties

112.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

113.    Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

114.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

115.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. In breach of their fiduciary duties owed to Walter Investment, Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company was involved in fraudulent practices that violated the False Claims Act; (b) the Company's Ditech subsidiary had a material weakness in its internal controls over financial reporting; (c) resultantly, the Company lacked adequate internal controls over financial reporting; and (d) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times, and

failed to properly oversee the Company's business, rendering them personally liable to the Company for breaching their fiduciary duties.

116.     Defendants had actual or constructive knowledge of the weaknesses of the Company's internal controls and that the Company was involved in fraudulent practices that violated the False Claims Act.  Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

117.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

118.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 22, 2017

**DONOVAN LITIGATION GROUP, LLC**

By: _____

Michael D. Donovan
15 Saint Asaphs Road
Bala Cynwyd, PA 19004-2405
Telephone: (610) 647-6067
Facsimile: (610) 647-7215
Email: mdonovan@donovanlitigationgroup.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**VERIFICATION**

I, MICHAEL E. VACEK, JR_____, have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Walter Investment Management Corp. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __8TH__ day of June 2017.

Name: